UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

In re:                                    )
                                          )
LLS AMERICA, LLC,                         )        No. 09-06194-PCW11
                                          )
            Debtor.                       )
_____        )
                                          )
BRUCE P. KRIEGMAN, solely in              )
his capacity as court-appointed           )
Chapter 11 Trustee for LLS America,       )
LLC,                                      )
                                          )
            Plaintiff,                    )        Adv. No. 11-80093-PCW11
                                          )
vs.                                       )
                                          )
PAUL COOPER, et al.,                      )
                                          )        MEMORANDUM DECISION RE:
                                          )        DEFENDANTS SHELDON FRANK'S
                                          )        AND MARGARET MILLER'S
            Defendants.                   )        MOTIONS TO DISMISS
_____        )

## **FACTS AND BACKGROUND**

In 1997, Ms. Doris Nelson, while living in British Columbia, Canada, started a store front business making short term loans to consumers at high interest rates, commonly referred to as "payday loans." In 2001, Ms. Nelson relocated to Spokane, Washington, and in December of that year began operating a store front payday loan business in Spokane as well as continuing to manage the Canadian store fronts. By 2003, the Canadian operation had become telephone based, with the Spokane operation

MEMORANDUM DECISION RE: . . . - Page 1

following suit and, as the decade progressed, all operations became internet based. By 2005, all employees, all office equipment, most bank accounts and all financial records were located in Spokane.

There are numerous corporate entities relevant to this matter, however, the payday loan business was primarily conducted through two corporate entities, Team Spirit America, LLC ("TSA") and LLS America, LLC ("LLS America"), both wholly owned by Ms. Nelson. The original Canadian store front businesses had been operated by at least three different corporate entities doing business under similar names. The most recent operating entity was Little Loan Shoppe Canada, Ltd. ("Little Loan Shoppe Canada") registered in Nevada. In 2001, Ms. Nelson opened the first of three payday loan stores in Spokane which operated under the name of Little Loan Shoppe America, LLC ("Little Loan Shoppe America"). In 2002 or 2003, another entity, 639504 BC, Ltd., was formed purportedly to conduct the telephone payday loan business in Canada. In 2005, Little Loan Shoppe, LLC, was incorporated in Nevada and LLS America was registered in Nevada in 2005.

As early as 1998, Ms. Nelson began obtaining money from individuals for use in the business.[1] This investment activity involved most of the corporate entities and the activity gradually increased. For example, Little Loan Shoppe Canada received $57,000 of investor funds in 1998, $509,900 in 2000, and in 2005, the year it terminated its existence, received $12,720,000. Little Loan Shoppe America in 2001 received $108,800 of investor funds and in 2005 received $3,135,700. LLS America in 2006 received $10,997,000 from investors. By the time of the 2009 bankruptcy filing, the funds from the investors totaled approximately $137,000,000 among the various corporate entities.

The investors received promissory notes for the amount of funds invested, which were signed by Ms. Nelson on behalf of any one of the multiple corporate entities. The notes bore interest rates which varied from 30 to 60 percent, with most bearing interest

---

[1]During these proceedings, the individuals are periodically referred to as "lenders" and periodically as "investors." The latter term will be utilized in this decision.

MEMORANDUM DECISION RE: . . . - Page 2

at the rate of 40 percent. The notes provided that all related corporate entities were liable for repayment of the funds. There were literally hundreds of notes issued to over 800 investors located in the United States and Canada.

In the fall of 2005, Ms. Nelson formed three Canadian entities: 0738106BC, Ltd., 0738116BC, Ltd., and 0738126BC, Ltd. According to Ms. Nelson, the purpose of the formation was to pay certain expenses associated with payday loan operations in Canada and, more importantly, they were formed at the behest of the Canadian investors. The Canadian investors, according to Ms. Nelson, desired their initial investments to be paid to a Canadian entity rather than to LLS America or some other entity formed in the United States to avoid United States tax consequences to the investors. Purportedly for that reason, repayments were to be sent from LLS America to a Canadian entity for disbursement to Canadian investors. Assuming that this was the purpose of the formation of these entities, that purpose was never effectuated. None of these three Canadian entities conducted any business.

The numerous other entities formed by Ms. Nelson included 42 Nevada companies and 25 Utah companies formed in 2008 for future business needs which were never active. There are approximately a dozen other entities not referenced herein which did engage in some activity. The most active, in addition to the primary entities of TSA and LLS America, include D&D Associates, LLC; 360 Northwest Telecom, LLC; and Global Edge Marketing. All were wholly owned by Ms. Nelson or family members of Ms. Nelson and all were operated from the same Spokane office.

On July 10, 2009, an involuntary chapter 11 proceeding was filed in this district by creditors of LLS-A, LLC, another entity owned by Ms Nelson. LLS America filed a chapter 11 bankruptcy proceeding in Nevada on July 21, 2009. Venue of the Nevada case was transferred to this district on October 22, 2009. On March 15, 2010, an examiner was appointed to investigate the financial affairs of the debtors. The examiner issued four reports, which reports form the basis of the facts contained herein. On September 8, 2011, an order was entered consolidating the reorganization of the various

MEMORANDUM DECISION RE: . . . - Page 3

corporate entities, which reorganization continues under the auspices of a trustee.

Simplistically, the examiner determined that the financial affairs and books and records of all the entities were inexorably intertwined. There were also issues concerning intermingling with Ms. Nelson's personal financial affairs. The examiner found that investor funds as well as all income from the payday loan business flowed interchangeably from and through the numerous corporate entities in an indivisible stream. The same flow occurred among the bank accounts located in both the United States and Canada. As found by the examiner in his First Interim Report of Examiner, ECF No. 240, page 11,

> Generally speaking, cash was most often transferred from whichever entity or account it happened to be in at any given time to whichever entity or account happened to need cash.

The examiner concluded that LLS America, TSA, and LLS Canada and the other active operating entities were treated as a single business enterprise, which enterprise had never been profitable. The financing of the business enterprise occurred in the form of the loans or investments by the 800 plus investors. As stated by the examiner, the payday loan business was "little more than a front" for obtaining funds from the investors. The amount contributed by investors was approximately 34 times the gross revenue generated by the business activity.

The decision to substantially consolidate relied upon the examiner's reports and other evidence. The court found that historically there were insufficient funds from the totality of the LLS America business enterprise as a whole to both operate and repay investors. Although no judicial determination was made that, in fact, a Ponzi scheme existed, the court found that indicia of a Ponzi scheme existed. The only meaningful payment source for early investors were additional funds from later investors and investors were promised artificially high returns.

Motions to dismiss were filed by two of the 20 defendants in this particular adversary proceeding, which is one of hundreds of adversary proceedings commenced by the trustee of the bankruptcy estate. Those adversaries seek, on various grounds, to

MEMORANDUM DECISION RE: . . . - Page 4

recover distributions made to the investors. The defendants in this adversary are residents of Canada and of the United States who received disbursements on their investments and who also received "commissions" for referring other investors to Ms. Nelson.

## ISSUES

The motions to dismiss are based upon three grounds:

1. Lack of personal jurisdiction;

2. Ineffective service of process; and

3. The improper imposition of United States bankruptcy law.[2]

## PERSONAL JURISDICTION

A.     Do the defendants have sufficient minimum contacts with the forum to result in personal jurisdiction?

The plaintiff must allege sufficient facts to demonstrate a *prima facie* showing that the personal jurisdiction exists. *Marine Midland Bank, N.A., v. Miller*, 664 F.2d 899, 904 (2nd Cir. 1981). Personal jurisdiction exists if the defendant had minimum contacts with the forum. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310 (1945); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985); and *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911 (9th Cir. 1990). The Ninth Circuit has adopted a three-prong test to evaluate the nature and quality of the defendant's contacts with the forum.

1.     The defendant must have performed some act or engaged in some transaction within the forum or availed himself of the privilege of conducting activities in the forum, thus invoking the benefits of the forum's laws.

2.     The claim at issue must arise from, or result from, the activity related to the forum.

---

[2]The motions also alleged that the complaint did not comply with Fed. R. Civ. P. 9(b) as it failed to state with particularity the fraud alleged under 11 U.S.C. § 548 of the Code. Dismissal on that ground was previously denied.

MEMORANDUM DECISION RE: . . . - Page 5

3. The forum's exercise of jurisdiction must be reasonable.

*Data Disc, Inc. v. Systems Technology Associates, Inc*., 557 F.2d 1280 (9th Cir. 1977).

Personal jurisdiction arises from the actual course of dealing between the parties. The defendants' conduct related to the activity being conducted must be examined. Personal visits to the forum, telephone, e-mail and other communications sent to the forum and documents negotiated, signed or recorded in the forum are examples of the types of activity which may reach the level of the required minimum contacts. *Sher v. Johnson*, 911 F.2d 1357 (9th Cir. 1990).

The well publicized Ponzi scheme conducted by Bernard Madoff resulted in a chapter 11 proceeding in the Southern District of New York. The trustee in that chapter 11, as has the trustee in this chapter 11, commenced numerous adversary proceedings seeking to recover distributions from the Madoff organization to the investors as fraudulent transfers under 11 U.S.C. § 548 of the Bankruptcy Code and state law. The Southern District of New York was faced with jurisdictional issues similar to those presented here. Applying the three factors referenced above and the requirements of Fed. R. Civ. P. 12(b)(2), personal jurisdiction was found to exist as to the defendants who resided outside the United States. *In re Bernard L. Madoff Inv. Sec., LLC*, 418 B.R. 75 (Bankr. S.D.N.Y. 2009) and *In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 274 (Bankr. S.D.N.Y. 2010).

Some facts in those decisions are similar to those that exist in this controversy, but the most significant difference is that the defendants in those adversaries had appointed agents in New York to act on their behalf with regard to certain of the transactions. These decisions are instructive, however, as the legal issues arose in the same context as the hundreds of adversaries now pending before this court.

The foreign resident defendant in *Madoff*, 440 B.R. 274, argued that her only physical presence in the United States related to annual social visits with friends and family and that she conducted no business in the United States. She never personally requested any of the transfers from the debtor which were made to her United States

MEMORANDUM DECISION RE: . . . - Page 6

bank account over a period of some years. The court found that the claims in the adversary proceeding arose from the transfers and even if the defendant was "merely a passive recipient" of the fraudulent transfers, it was reasonable to anticipate that adjudication of matters relating to those transfers would occur in the United States.

In *Madoff*, 418 B.R. 75, the court relied upon the fact that over a course of years there were regular communications between the foreign resident defendant and the United States debtor. The court stated that its exercise of jurisdiction was reasonable as the United States has a strong interest in enforcing 11 U.S.C. § 548 of the Bankruptcy Code, particularly as the purposeful investment activities of the defendant contributed to the massive losses suffered by United States victims of the Ponzi scheme. Further, the debtor was a New York corporation, with its financial and other records in that jurisdiction and liquidation of the debtor was occurring in the New York bankruptcy court.

The records in this case reveal that defendant Frank filed a proof of claim for $65,000 Canadian funds and $5,000 United States funds, which claims arose from loans or investments in the debtor. Plaintiff alleges that there were 13 promissory notes issued to defendant Frank and signed by Ms. Nelson in Spokane over the course of some years. Plaintiff also alleges defendant Frank received distributions from the debtor on 330 occasions and that he solicited other individuals to make investments in the debtor. Although no communication records of the debtor exist prior to 2005, the examiner reported that thousands of e-mails were sent to investors from Ms. Nelson, including mass e-mails to all investors.

According to the debtor's records, beginning in 2005, defendant Miller was paid commissions for successfully soliciting 28 other investors in the debtor. The examiner stated that defendant Miller was "very active in the Lender loan administration process and worked closely with Nelson on communications with Lenders and in administrating the loans made by the Lenders" that defendant Miller had recruited. She prepared drafts and edited mass e-mails to all investors which, according to the examiner, "were clearly

MEMORANDUM DECISION RE: . . . - Page 7

solicitous in nature." Plaintiff alleges that Ms. Miller held 15 notes, the last of which is dated August 8, 2006.

These facts support the conclusion that these defendants engaged in conduct with the forum and availed themselves of monetary opportunities, which would not have existed but for the activities of the debtor and the defendants in the forum. The claims brought by the trustee in this adversary proceeding are the direct result in the defendants' actions relating to these investments, which were closely related to the forum.

The exercise of jurisdiction by this court is reasonable. It is the forum in which the reorganization of the debtor is occurring. It is the forum which is managing the hundreds of similar adversary proceedings arising out of the alleged Ponzi scheme. The adversary proceedings have been divided into groups based upon the underlying facts and the similar legal issues. The hundreds of named defendants, including the moving parties, have appeared through specific counsel who represent specific groups of defendants whose interests are aligned factually or legally. This is the only forum which can efficiently and expeditiously manage these adversary proceedings.

B.    <u>Assuming that minimum contacts do not exist, have the defendants consented to the forum's exercise of jurisdiction?</u>

1.    Did the filing of a proof of claim by defendant Frank result in a consent to jurisdiction?

Prior to the Supreme Court's decision in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), courts generally recognized that the filing of a proof of claim constituted the creditor's consent to the bankruptcy court's core jurisdiction over the resolution of that claim. *Langenkamp v. Culp*, 498 U.S. 42 (1990); *Katchen v. Landy*, 382 U.S. 323 (1966). Relying on *Langenkamp*, the Ninth Circuit held in *In re G.I. Indus., Inc.*, 204 F.3d 1276 (9th Cir. 2000), that the filing of a proof of claim converted a non-core breach of contract claim into a core proceeding as a result of the filing of the proof of claim. The filing of the proof of claim triggers the "claims allowance process" which is an exercise of the bankruptcy's core jurisdiction to determine the validity and the amount of that

MEMORANDUM DECISION RE: . . . - Page 8

claim.

By filing a proof of claim in a bankruptcy proceeding, the creditor is affirmatively seeking relief from the bankruptcy court on that claim, i.e., payment on the claim. A consent to personal jurisdiction is necessary for the bankruptcy court to entertain the claim and determine the right to payment in accordance with the statutory bankruptcy scheme. The consent is implicit. The Code sets forth a process and certain principles and rules which apply to the claim. The act of filing a proof of claim deems the creditor to have a right to payment under 11 U.S.C. § 502, absent objection or grounds set forth in the Code. The claim may be classified and treated with other claims under 11 U.S.C. § 1122 and may be subject to the bankruptcy court's application of the principles of equitable subordination under 11 U.S.C. § 510(c) and other statutory provisions which determine the validity, amount and treatment of the claim.

As part of the claims determination process, the bankruptcy court applies § 502(d). That section precludes the allowance of a claim by any entity which received a transfer which is voidable under 11 U.S.C. § 547 or 11 U.S.C. § 548 or other provisions of the Code. The claim is to be disallowed unless the holder of the claim has returned the funds or property improperly transferred. It is axiomatic that in order to determine the validity, amount and treatment of a proof of claim, the bankruptcy court must determine whether an improper transfer has occurred.

*Langenkamp* and *Katchen* also held that a creditor who files a proof of claim consents to bankruptcy jurisdiction to determine any claim the bankruptcy estate may hold against the creditor if that claim arises under the preference sections of the Bankruptcy Code. *Stern* did not change this longstanding principle. Citing *Langenkamp* and *Katchen*, the Supreme Court in *Stern* again stated that one who invokes the aid of the bankruptcy court by filing a proof of claim submits to the jurisdiction of the bankruptcy court to adjudicate the debtor-creditor relationship. A counterclaim or cause of action by the estate against the creditor based upon the provisions of the Bankruptcy Code is integral to the restructuring of the debtor-creditor relationship. The prior

MEMORANDUM DECISION RE: . . . - Page 9

Supreme Court decisions so holding were not overruled by *Stern*.

The ultimate holding of *Stern v. Marshall, supra,* is

Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

*Stern v. Marshall, supra*, at 2620.

In so holding, the Supreme Court narrowed the holding in *Langenkamp* as it relates to the bankruptcy court's adjudication of state law counterclaims raised by a chapter 7 debtor in response to the creditor's proof of claim. *Stern* concluded that if a bankruptcy court must address the merits of a creditor's liability as part of the claims allowance process, then the bankruptcy court has jurisdiction to adjudicate that liability. However, if resolution of the estate's claim against the creditor would not necessarily resolve the merits of the creditor's claim against the estate, the bankruptcy court's jurisdiction cannot be based upon the creditor filing of a proof of claim.

As § 502(d) requires adjudication of the creditor's claim against the estate to include adjudication of any allegation of an unlawful transfer to the creditor. Such allegations are an integral part of the creditor-debtor relationship evidenced by the proof of claim. The issue of whether a transfer from the estate to the creditor is unlawful under the Bankruptcy Code or state law necessarily determines the validity and amount of the creditor's claim against the estate.

The adjudication of preferences received by a creditor is an integral part of the claims allowance process. The *Stern* opinion generally stands for the proposition that the filing of a proof of claim in bankruptcy is not a consent to personal jurisdiction over claims held by the estate which are unrelated to bankruptcy law or unrelated to the creditor's claim against the bankruptcy estate. *Stern* did not abrogate existing decisional authority that the filing of a proof of claim in bankruptcy is a consent to personal jurisdiction over claims held by the estate which arise under bankruptcy law or are

MEMORANDUM DECISION RE: . . . - Page 10

related to the creditor's claim against the estate.

        2.     By seeking affirmative relief in this adversary proceeding, did the defendants consent to personal jurisdiction?

In addition to filing a proof of claim, other actions of the defendants may operate as a consent to personal jurisdiction. Both of the moving parties, joined with other defendants in this adversary, filed a motion to withdraw the reference of this adversary from the bankruptcy court to the district court. Through their counsel, they argued the motion. By that motion, the moving parties sought affirmative relief and purposely availed themselves of the jurisdiction of the federal courts in this judicial district.

Defendant Frank filed a proof of claim in the chapter 11 proceeding and both defendants Frank and Miller filed a motion in the adversary seeking relief from the federal courts of this district. Thus, both of the moving parties have consented to the bankruptcy court exercising its jurisdiction over their claims, including any related claim of the estate for preferential transfers.

## **SERVICE OF PROCESS**

On August 18, 2011, the deputy clerk of the bankruptcy court sent by international registered mail a copy of the summons and complaint to the defendants Frank and Miller at their respective addresses in British Columbia Canada. Receipts of service with delivery dates of August 30, 2011 and August 26, 2011, respectively, were received by the clerk of the court. The issue is whether service of process of an adversary complaint on a resident of British Columbia by international mail, with return receipt, is sufficient to result in personal jurisdiction.

Bankruptcy Rule 7004 adopts Fed. R. Civ. P. 4(f), which rule authorizes service of process of civil actions upon individuals in another country.  Fed. R. Civ. P. 4(f) states:

> (f) Serving an Individual in a Foreign Country. Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served at a place not within any judicial district of the United States:

MEMORANDUM DECISION RE: . . . - Page 11

> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

The United States and Canada are signatories to the Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention") which provides in Article 10(a):

> Provided the State of destination does not object, the present Convention shall not interfere with –
> (a)     the freedom to send judicial documents, by postal channels, directly to persons abroad.

Although at least one circuit has held to the contrary, *see Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8th Cir. 1989), the Ninth Circuit has held that Article 10(a) is applicable to original service of process. *Brockmeyer v. May*, 383 F.3d 798 (9th Cir. 2004).

Authorization for international service of process by mail is provided in Fed. R. Civ. P. 4(f)(2)(C)(ii), which allows extra territorial service by the clerk of the court in which the civil action is pending by registered mail, with return receipt. Such service is effective unless the country of the recipient has prohibited such service. Plaintiff maintains that Canada, in its formal response to the Hague Convention, states that it does not object to service of process by postal channels.[3] Defendants have not refuted that contention.

Service of process upon defendants Frank and Miller was proper under Fed. R. Civ. P. (f) (2) and the Hague Convention.

---

[3]British Columbia Supreme Court Rule 4, which relates to service of process and service of judicial documents, requires personal service of original service of process, but provides an exception in Part 4-4. In British Columbia, if it is "impracticable to serve a document by personal service," the court may allow alternative means of service. Alternative means would include service by publication, service by registered mail, service by fax or any other alternative means that the British Columbia court determined reasonable. Under British Columbia law, not only is service by registered mail return receipt not prohibited, it may be allowed in certain circumstances.

MEMORANDUM DECISION RE: . . . - Page 12

## <u>CHOICE OF LAW</u>

Defendant Frank moves to dismiss the trustee's adversary complaint arguing that the adjudication of plaintiff's claims would be an impermissible extraterritorial application of United States bankruptcy law to Canadian citizens and transactions. In support of his argument, defendant in ECF No. 59, page 12 asserts that

> It is a long-settled principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' *In re Midland Euro Exch., Inc.,* 347 B.R. 708, 715 (Bankr. C.D. Cal. 2006) (quoting *In re Maxwell Commc'n Corp.,* 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994)).

Defendant Frank further argues that all relevant transactions occurred outside the borders of the United States. Thus, an adjudication of this adversary by this court would be an extraterritorial application of fraudulent transfer law. Defendant Frank asserts that this court cannot enforce 11 U.S.C. § 548, absent clear legislative intent that it may be applied outside the United States.

Before deciding how the presumption against extraterritorial application of federal statutes affects the interpretation of § 548, the court should first consider whether or not the presumption applies at all. *In re French*, 440 F.3d 145 (4th Cir. 2006). Courts only apply the presumption against extraterritorial application when a party seeks to enforce a statute beyond the territorial boundaries of the United States. The presumption has no bearing when the conduct that Congress seeks to regulate takes place primarily within the United States. *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993). Only after it has been determine that the facts as a whole have a center of gravity outside the United States does the court's analysis turn toward the presumption and any exceptions thereto.

Not every transaction which has a foreign element constitutes the extraterritorial application of law. Jay L. Westbrook, *The Lessons of Maxwell Communication*, 64 Fordham L. Rev. 2531 (1996). Courts must look at the facts of each case to determine whether or not the center of gravity of the transaction exists outside the United States. *In re Pacat Fin. Corp.*, 295 F. 394, 401 (S.D.N.Y. 1923).

MEMORANDUM DECISION RE: . . . - Page 13

Whether the choice of law is between the law of two states or between the law of the United States and another sovereign, identification of the applicable body of law requires a determination of the locus or center of gravity of the underlying dispute. *Gates v. P.F. Collier, Inc.*, 378 F.2d 888 (9th Cir. 1967). That decision discussed the Restatement of the Law of Conflict of Laws to determine which law, that of Japan or that of the United States, would be applicable to an international dispute involving a breach of contract and fraud.

The court in *Gates*, *supra*, at p. 893 referring to the prior version of the Restatement stated:

> A study of the writings on the subject of Conflict of Laws and of many recent court decisions, all of which unite in discrediting the rules of the Restatement, fails to disclose any theory or statement of principles which would call for the application of the law of Japan to the issues in this case, whether sounding in tort or in contract. This rapid, current change in the accepted views respecting conflict of laws is reflected in the decisions of the New York courts which adopt what has been called the 'center of gravity' or 'grouping of contacts' theory of the conflict of laws. [footnote omitted]. These cases place emphasis upon the law of the place 'which has the most significant contacts with the matter in dispute.' In Kemart Corporation v. Printing Arts Research Lab. Inc., 269 F.2d 375, 392-393, this court applied what it called the 'most significant relationship' rule in determining proper choice of law.

*Gates* and the current Restatement both conclude that if the events giving rise to the dispute primarily occurred or are primarily related to a particular jurisdiction, the laws of that jurisdiction apply. In international disputes, courts " . . . must look at the facts of a case to determine whether they have a center of gravity outside the United States." *In re Maxwell Communication Corp. plc by Homan*, 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994), *aff'd on other grounds*, 93 F.3d 1036 (2nd Cir. 1996). The laws of the jurisdiction which has the most significant relationship to the dispute are applicable in resolving the dispute. Only if the gravamen of the dispute is located outside the United States does the issue of extraterritorial application of United States law then become relevant. In this situation, the question presented is whether the locus or center of gravity of the events which gave rise to this adversary is in Washington or British Columbia. If the events giving rise to the dispute primarily occurred in and were related to activities

MEMORANDUM DECISION RE: . . . - Page 14

1  in this jurisdiction, the laws of this jurisdiction apply.

2      Some of the components of the conglomerate of legal entities which compose the
3  debtor-in-possession engaged in the business of making so-called "payday loans," a
4  legitimate business activity. However, the focus of this dispute is not the "payday" loan
5  business, but the alleged Ponzi scheme which was being operated by Mrs. Nelson
6  through various entities of the conglomerate debtor-in-possession.

7      This specific motion concerns only one adversary of the hundreds filed and only
8  two defendants of the 20 defendants named in this adversary. In analyzing the motion,
9  the existence of other defendants and the other adversary proceedings cannot be ignored.
10 Unlike most choice of law disputes involving a single transaction or a limited number
11 of transactions among very few parties, the events which gave rise to this dispute arose
12 from the solicitation of investments involving hundreds of investors located both in the
13 United States and Canada. It involves numerous legal entities and thousands of
14 transactions occurring over a period of years. Under such circumstances, the focus must
15 be on that activity as a whole rather than a specific transaction with a specific party at
16 a specific place in time.

17     Most of the defendants in this adversary, as well as the defendants in the hundreds
18 of other similar adversaries, filed proofs of claims to which most attached copies of the
19 promissory notes which evidence the funds provided by the investors. There are literally
20 hundreds of such notes. A review of the notes relevant to all the defendants in this
21 adversary reveals that of the 81 complete copies of notes attached to proofs of claims,
22 62 stated that the laws of Canada would control and 19 stated that the laws of either
23 Washington or Nevada would control. Often an individual investor was a party to
24 multiple notes, some of which refer to the law of Canada and some of which refer to
25 Washington law and some of which refer to Nevada law.

26     The notary stamps on the notes relevant to this adversary reveal that Ms. Nelson,
27 on behalf of any one of the multiple corporate entities, signed the notes in Spokane.
28 Ms. Nelson resided in Spokane at all relevant times and all employees of the numerous

MEMORANDUM DECISION RE: . . . - Page 15

legal entities were located in Spokane as were all the financial and other business records. The management of the affairs of all the entities occurred from the same Spokane office. As stated by the examiner, there were literally thousands of e-mail communications generated from Spokane to the investors.

The declarations filed by the two defendants who filed the current motions state that each defendant is a resident of Canada and do not conduct business in the United States. Both defendants state they were in Canada at the time their various investments were solicited, but do not describe the manner of the solicitation. Both state that the repayments and commissions were sent by them to a Canadian entity, but do not identify the entity or mode of repayment. Plaintiff alleges a repayment of $26,781 was distributed to defendant Frank from United States banks. Defendant Frank further states that at the time of his initial investment, LLS America was doing business in Canada. Mr. Frank also states that on three occasions he traveled to Spokane to discuss and view the operations of LLS America, but did not invest at that time.

Although there undoubtedly were events relevant to this dispute which occurred in Canada, the evidence indicates that this cross-border activity, whether or not it constituted a Ponzi scheme, had it center or gravity in Spokane, Washington. The application of the doctrine of conflict of laws results in the conclusion that the laws of the United States and not the laws of Canada are applicable.

## CONCLUSION

In conclusion, this court has jurisdiction concerning the claims asserted against defendants Miller and Frank as the defendants' course of conduct with the consolidated debtor satisfies the requirement of minimum contacts for personal jurisdiction. Jurisdiction arose by defendant Frank filing a proof of claim in this matter. The resolution of the estate's claims against both defendants is integral to the adjudication of the creditor-debtor relationship between the debtor and the defendants. Additionally, both defendants consented to personal jurisdiction by filing a motion seeking affirmative relief in this adversary proceeding. Pursuant to Fed. R. Civ. P. 4(f)(2), the Hague

MEMORANDUM DECISION RE: . . . - Page 16

Convention and Fed. R. Bank. P. 7004, defendants have been properly served. Finally, the doctrine of conflict of laws results in the application of the law of the United States to this dispute. Therefore, defendants Margaret Miller's and Sheldon Frank's Motions to Dismiss are **DENIED**.

Patricia C. Williams
Bankruptcy Judge

07/02/2012 11:59:18